# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2059

DELISA ROSS,

*Plaintiff-Appellant*,

*v.*

RJM ACQUISITIONS FUNDING LLC,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6557—**Geraldine Soat Brown**, *Magistrate Judge*.

ARGUED JANUARY 4, 2007—DECIDED MARCH 13, 2007

Before POSNER, RIPPLE, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. When a debtor's debts are discharged in bankruptcy, efforts to collect them are unlawful. A debtor dunned after bankruptcy, if he knows his rights, can simply ignore any dunning letter he receives in respect of one of the discharged debts. But there is a danger that debt collectors would continue sending these letters, thinking that the recipient mightn't realize that his debts had been discharged or that the debt he was being dunned for, perhaps long after the bankruptcy, was among the debts that had been discharged. Or he might think the debt was a debt that cannot be discharged in bankruptcy.

Dunning people for their discharged debts would under-mine the "fresh start" rationale of bankruptcy (bankruptcy as a system of debtors' rights as well as creditors' remedies), and is prohibited by the Fair Debt Collection Practices Act, which so far as relates to this case prohibits a debt collector (a defined term) from making a "false representation of the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Although not aimed specifically at efforts to collect debts that have been discharged in bankruptcy, this provision fits that practice to a T. *Turner v. J.V.D.B. & Associates, Inc.*, 330 F.3d 991, 994-95 (7th Cir. 2003); cf. *Randolph v. IMBS, Inc.*, 368 F.3d 726, 728 (7th Cir. 2004) ("a demand for immediate payment while a debtor is in bankruptcy (or after the debt's discharge) is 'false' in the sense that it asserts that money is due, although, because of the automatic stay (11 U.S.C. § 362) or the discharge injunction (11 U.S.C. § 524), it is not"). However, although the representation need not be deliberate, reckless, or even negligent to trigger liability— it need only be false—the Act provides a complete defense to a debt collector who "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).

This safety hatch is important because the Act authorizes damages in excess of the actual cost incurred by the victim of a violation: The victim is entitled to "any actual damage sustained by [him] as a result of" the violation, plus, "in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum

of the net worth of the debt collector." 15 U.S.C. §§ 1692k(a)(1), 2(A), (B). When damages are capped at the harm to the victim, a potential injurer will not take precautions to avert that harm that cost more than the cost the harm causes the victim. *Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 327 (7th Cir. 1993); *Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830, 835 (5th Cir. 1989); *Rhode Island Hospital Trust National Bank v. Zapata Corp.*, 848 F.2d 291, 295 (1st Cir. 1988). So if required by a court to pay more, he will spend more, if necessary to avert the harm, than the cost the harm causes the victim; and that is too much from an overall social standpoint. *Movitz v. First National Bank*, 148 F.3d 760, 763 (7th Cir. 1998); *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 593 (1996) (concurring opinion); compare *Kemezy v. Peters*, 79 F.3d 33, 34 (7th Cir. 1996). Hence the section 1692k(a) defense, which forgives mistakes, even though they inflict harm, when the cost of avoiding a mistake would be disproportionate to the harm.

We must decide whether the procedures that the defendant debt collector, RJM, adopted in order to try to avoid—unsuccessfully in the case of the plaintiff, Ross—dunning a debtor for a discharged debt were reasonable within the meaning of section 1692k(a).

In 2002 RJM purchased a number of charged-off accounts from Federated Department Stores; among them was a $574.72 debt that Ross owed Federated. The parties to the sale of the debts—Federated and RJM—agreed in the sale agreement that "they have not and will not intentionally attempt to collect[,] or collect[,] debt that has been discharged in bankruptcy." But Federated did not guarantee that the package of debts it was selling to RJM contained no discharged debts.

RJM retained its affiliate Plaza Associates to collect Ross's debt. In May 2003 Plaza Associates sent a dunning letter to

"Lisa Ross." That was the name under which she had in-
curred the debt to Federated, but she normally goes by the
name "Delisa Ross." Delisa Ross declared bankruptcy the
following month, listing the Federated debt under the
name Delisa Ross rather than Lisa Ross and stating that
Plaza Associates and RMA—not RJM—were trying to col-
lect the debt. There is a debt collector named RMA, but it is
unrelated to RJM and had nothing to do with Ross's debt.

Plaza Associates, having been named in the listing of the
debt in the bankruptcy proceeding, was notified of the
bankruptcy and realized (we are not told how) that the
debtor Lisa Ross was the bankruptcy debtor Delisa Ross. Not
waiting for the debt to be discharged, Plaza Associates
abandoned collection efforts and returned the Lisa Ross
file to RJM. But it failed to inform RJM what Lisa Ross's
true name was and that she had declared bankruptcy.

She received a discharge of the debt on October 17, thus
placing the debt beyond the reach of RJM. Plaza Associates
received notice of the discharge but did not forward it to RJM.
Many months later, RJM, not realizing that Lisa Ross was
Delisa Ross, twice mailed dunning letters to Lisa Ross at
Delisa Ross's address, for Ross had given her correct ad-
dress, though an incorrect name, to Federated. Ross did not
respond to either letter by paying RJM anything, but instead
referred the letters to her lawyer. He informed RJM that
Lisa Ross was the same person as Delisa Ross. RJM made
no further effort to collect the debt. Nevertheless, Ross—
whose lawyer's motto is "We sue abusive debt collectors,"
www.myfairdebt.com/b/62/david-philipps/, visited Jan. 19,
2007—sued RJM. The district court granted summary judg-
ment in favor of RJM on the basis of the section 1692k(c)
defense, and Ross appeals.

RJM was mindful of its legal duty not to dun a discharged
bankrupt, and to that end conducted a computerized search

of bankruptcies, which failed however to reveal Delisa Ross's bankruptcy because the search was for Lisa Ross, the name on the account that had been sold to RJM for collection.

RJM had several procedures in place to minimize errors such as occurred in this case: an understanding with the firms that sell it debts for collection that they would not knowingly sell RJM a discharged debt and that they would notify RJM if after forwarding a debt they discovered that it had been discharged or had otherwise become uncollectable; RJM's bankruptcy search (actually done for it by another firm); Plaza's promise to notify RJM if it received a notice of discharge; and RJM's prompt cessation of any attempt to collect a debt upon notification that it had been discharged. These procedures are reasonable—indeed *Hyman v. Tate*, 362 F.3d 965, 968-69 (7th Cir. 2004), holds that the first and fourth are enough to discharge the duty of reasonableness, remarking that only .01 percent (1 in 10,000) of all the debts referred for collection by the debt collector in that case were later discovered to have been discharged in bankruptcy. *Id*. at 968; see also *Kort v. Diversified Collection Services, Inc.*, 394 F.3d 530, 539 (7th Cir. 2005); *Jenkins v. Heintz*, 124 F.3d 824, 834-35 (7th Cir. 1997); *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 401-02 (6th Cir. 1998). We estimated in *Hyman* that it would have cost the defendant $1.5 million to obtain a credit report on each debtor. That was too much relative to the likely harm caused by the dunning letters mailed in error in that case—and in this one. There may for all we know be a nefarious practice of dunning these unfortunates and laying off only if the plaintiff is fortunate enough to be represented by a bulldog like Mr. Philipps. But there is no evidence of this.

The plaintiff argues that with the rapid advances in digital search technology, pertinently illustrated by the feature of the Google search engine that asks the searcher "do you mean?" when the searcher has mistyped a word yet it is

possible to infer what word he probably meant, RJM should have adopted a search method that would have pegged Lisa Ross as Delisa Ross. We don't know whether such a method is as yet commercially available. If you type "Lisa Ross" into Google, you don't get "do you mean Delisa Ross?" Google's approach looks for spelling variations and suggests a variant (usually the correct) spelling if it produces substantially more hits. That won't work for most searches on names, unless you misspell a famous and distinctive one. So type "Lisa Ross" into Google and you get such things as "Lisa Ross Birth & Women's Center." And in a Boolean search the exclamation mark serves as a root expander, so that the name "ros!" will turn up ross, or roster, or rostenkowski, but no "Delisa Ross." There are other types of search algorithm as well, such as phonetic and approximate-string matching algorithms, see, e.g., http://en.wikipedia.org/wiki/Soundex; /www. codeproject. com/string/dmetaphone6.asp; http://en.wikipedia.org/ wiki/Approximate_string_matching, but they probably would not have detected the error either.

Even if there is a search algorithm that would have turned up Delisa Ross in a search under the name Lisa Ross, it would not make her case. The word "reasonable" in the Fair Debt Collection Practices Act defense cannot be equated to "state of the art," which is to say, at the technological frontier. For then whenever a new, more powerful search program came on the market, debt collectors who failed to purchase it post haste would find themselves sued by clients of Mr. Philipps seeking statutory damages on top of any actual damages they might have suffered. The investment would be disproportionate to the slight aggregate harms resulting from the handful of dunning letters that modest procedures occasionally let through the sieve.

Still another objection would be to the invasions of privacy that would result from the breadth of search designed to

identify people using more than one name. It is not their privacy that concerns us but that of people who have nothing to do with the debt that the debt collector is trying to collect. Had RJM searched under "Ross," or searched under Ross's address or social security number (a search that if conducted today, however, would be limited to the last four digits because the full number, though required to be submitted to the bankruptcy court, is no longer public, Bankr. R. 1005, 1007(f); Laura DiBiase, "Identity Theft in the Bankruptcy World," 22-9 *Am. Bankr. Inst. J.* 36, 36 (2003)), it might have collected financial information about a host of people named Ross who were not Delisa Ross, including family members at her address, persons with the name Ross at a different address (since she might have moved), and people with similar social security numbers.

Liability would be especially perverse in this case because the plaintiff is the principal author of the harm of which she complains. In her bankruptcy schedule she was required to list debts contracted under aliases, Bankr. R. 1005, a simple and salutary precaution that she was irresponsible in omitting. *In re Tully*, 818 F.2d 106, 110-12 (1st Cir. 1987). "The successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity and his willingness to make a full disclosure*." In re Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974). Ross flouted that duty. She was what economists, and even some judges, call the "least cost avoider" of the harm for which she now seeks legal redress. *Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 743 (7th Cir. 1999); *United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1314-15 and n. 10 (7th Cir. 1978); *Rankin v. City of Wichita Falls*, 762 F.2d 444, 448 n. 4 (5th Cir. 1985).

But shouldn't we worry about the role of Plaza Associates, a well-known debt-collection company (see www. plazaassociates.com/, visited March 7, 2007) that is affiliated with (probably the parent of) RJM? It was Plaza Associates

that committed the blunder that resulted in the dunning letters to Ross—and can a debt collector be permitted to evade the statute by delegating to an affiliate the responsibility for determining whether a debt referred to the debt collector for collection has been discharged in bankruptcy? But that is not what happened here. Plaza is a debt collector too, and was operating in that capacity when it mailed the dunning letter to Ross. See 15 U.S.C. § 1692a(6). Presumably it escaped being sued only because it mailed its dunning letter before Ross declared bankruptcy, and therefore its letter contained no false representation.

But even if we collapsed the two companies into one, attributing Plaza's blunder to RJM, Ross could not prevail. Remember that a mistake is not fatal if it was committed even though reasonable procedures for avoiding mistakes were followed; and we are given no reason to doubt that Plaza's procedures were reasonable. The reason for its mistake may simply have been that the notice of Ross's discharge in bankruptcy named RMA, not RJM, as the creditor. Maybe Plaza forwarded the notice to RMA rather than to RJM. Of course, if so, RMA may have returned it to Plaza, but even then Plaza might not have guessed that the real creditor was RJM.

RJM has moved for an award of sanctions under Rule 38 of the appellate rules, arguing that Ross's appeal is frivolous. The appeal has failed, but it is not frivolous, though we warn Mr. Philipps that he is skating near the edge of his pond.

The judgment is affirmed, the motion for sanctions denied.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*